UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

JOSEPH MONTALDO,

                                                    Plaintiff,

                    -against-

THE COUNTY OF SUFFOLK,

                                                    Defendant.
------------------------------------------------------------------------X

For Online Publication Only

**FILED
CLERK**

3/31/2026 12:16 pm

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

**MEMORANDUM & ORDER**
21-cv-1272 (JMA) (ARL)

**AZRACK, United States District Judge:**

Plaintiff Joseph Montaldo brings this action against Defendant the County of Suffolk ("the County") alleging that the County's Police Department violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 et seq.  Before the Court is Defendant's motion for summary judgment.  For the reasons set forth below, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

### A.  Undisputed Facts

The following facts are drawn from Defendant's Rule 56.1 Statement of Material Facts (ECF No. 38-2 ("Def. 56.1 Stmt.")), Plaintiff's Rule 56.1 Counterstatement to Defendant's Rule 56.1 Statement and Statement of Additional Material Facts (ECF No. 38-20 ("Pl. 56.1 Stmt.")), and Defendant's Counterstatement to Plaintiff's Rule 56.1 Statement (ECF No. 38-28 ("Def. Resp. 56.1 Stmt.")).[1]

---

[1] The Court has reviewed the factual assertions set out in the parties' Rule 56.1 Statements and the evidence cited in support of those factual assertions. The Court deems admitted all factual assertions that are supported by admissible underlying evidence cited by the parties.

From August 5, 1991 to October 2, 2018, Joseph Montaldo worked as a Public Safety Dispatcher ("PSD") at the Suffolk County Police Department ("SCPD").  (Pl. 56.1 Stmt. ¶¶ 1–3.) As a PSD, Montaldo would receive 9-1-1 calls, dispatch patrol units, and communicate with emergency response organizations.  (Id. ¶ 12.)  His workstation consisted of "a console table containing a phone, two keyboards, two mouse devices, a foot pedal for transmitting, a radio system, and six [computer] monitors."  (Id. ¶ 13.)  The six monitors were arranged in two rows, with two monitors in the top row and four monitors in the bottom row.  (See ECF No. 38-9.)

From April 28, 2013 to January 24, 2014, Montaldo was out on medical leave.  (Id. ¶ 15.) Montaldo was awarded workers' compensation benefits for the time he was out on medical leave. (Id. ¶ 16.)   During that time, an orthopedic surgeon diagnosed Montaldo with cervical radiculopathy.  (Id. ¶ 17.)  Montaldo was examined by the SCPD's Police Surgeon on July 16, 2013, November 25, 2013, December 24, 2013, and January 23, 2014.  (Id. ¶¶ 18–22.)  At the first three of these examinations, the Police Surgeon did not clear Montaldo to return to work, noting that Montaldo complained of a neck injury that made it painful for him to hold his head at the angle required to observe his monitors at work.  (See id. ¶¶ 19–21.)  At the January 23, 2014 examination, the Police Surgeon determined that Montaldo could return to work, noting that Montaldo said he was feeling better.  (Id. ¶ 22.)  The Police Surgeon reported that Montaldo was restricted from lifting more than 30 pounds and that his ability to balance was limited because he "must maintain a level head.  Looking up causes pins and needles in left arm."  (ECF No. 38-14 at 2; see also id. ¶ 22.)  The Police Surgeon further noted that Montaldo "must be careful looking up" and watch his "head angle to monitors" and that Montaldo's doctor recommended "an ergonomic stool to assist in raising [his] body position to monitors."  (ECF No. 38-14 at 2.)

Before he returned to work, Montaldo asked his supervisor to lower the higher monitors by moving them to stands on his desk, so that they would be "more neutral."  (Id. ¶ 29; see also

2

ECF No. 38-22 ("Montaldo Tr.") 46:20–47:14, 47:17–24, 55:1–56:6.)  That request was denied. (Id.; Montaldo Tr. 47:14, 56:5–6.)  He also asked his supervisors whether he could use a spare console that was not being used regularly, at which the monitors could be lowered.  (Id.; Montaldo Tr. 49:6–17.)  That request was also denied.  (Id.)

Montaldo returned to work on January 24, 2014 and was assigned to the same PSD shift that he worked before his medical leave.  (Pl. 56.1 Stmt. ¶¶ 15, 24.)

After he returned to work, on February 15, 2014, Montaldo requested an ergonomic stool. (Id. ¶ 25.)  He received no response.  (Id.)  On March 5, 2014, Montaldo raised this request again. (Id.)  On April 2, 2014, Montaldo had still not received a stool from the SCPD, so he purchased the stool for himself.  (Id. ¶¶ 25–26.)  He was not reimbursed for the purchase.  (Id.)  Montaldo used the stool until he retired, although he says that "the stool did not solve the problem since the monitors were still too high—as one was on top of the other—and even with having the stool elevate his position, it did not alleviate his pain."  (Id. ¶ 27.)

The height of the console table could be adjusted up and down.  (Id. ¶¶ 27–28.)  However, Montaldo "could not find a happy medium" because the monitors were stacked in two rows, meaning that "no matter what position he put the console in, (down or up), he had to tilt his head." (Id.)

On July 30, 2014, Montaldo filed an Equal Employment Opportunity Commission Charge of Discrimination with the New York State Division of Human Rights.  (ECF No. 38-18 ("EEOC Charge").)  In the EEOC Charge, Montaldo wrote that a neurological surgeon had determined that his cervical radiculopathy was "likely due to persistent hyper extension associated with viewing monitors in his position at work" and recommended that Montaldo "restrict his activities from this standpoint."  (Id. at 3.)  Montaldo also wrote that, at a November 6, 2013 hearing regarding his entitlement to worker's compensation benefits, his attorney requested that SCPD accommodate

3

Montaldo by lowering his computer screens and that a SCPD supervisor stated, "we are not lowering the monitors." (Id.)  The charge recounts that Montaldo made repeated requests for an ergonomic stool until he was eventually given permission to purchase one for himself, but that the stool did not alleviate his pain.  (Id.)

On August 6, 2017, Montaldo tripped and fell in the doorway to Police Headquarters.  (Pl. 56.1 Stmt. ¶ 9.)  He broke a bone in his elbow and injured his neck.  (Id.)  He never went back to work.  (ECF No. 38-4, 45:3–25.)

On October 2, 2018, Montaldo retired.  (Id. ¶ 3.)

## B. Procedural History

On March 10, 2021, Montaldo filed a Complaint alleging violations of the ADA and the NYSHRL.  (ECF No. 1 ("Compl.").)  Montaldo alleges that the County violated his rights under each statute in three ways: (1) by failing to provide reasonable accommodation for his known disability (Claims I and II); (2) by intentionally discriminating against him on the basis of his disability (Claims III and IV); and (3) by retaliating against him for reporting disability discrimination (Claims V and VI).  (Id. ¶¶ 28–67.)  Defendant now moves for summary judgment on all claims.  (ECF No. 38-1 ("Mot.").)

## II.    DISCUSSION

Under the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment if that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to

4

resolve all ambiguities and draw all factual inferences in favor of that party."  NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178 (2d Cir. 2008).  However, "[t]he litigant opposing summary judgment . . . may not rest upon mere conclusory allegations or denials[.]'"  Jimenez v. City of New York, No. 21-cv-613, 2024 WL 198319, at *4 (E.D.N.Y. Jan. 18, 2024) (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d. Cir. 1980)).

Disability discrimination claims under the ADA are subject to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009).  Under the McDonnell Douglas framework, "a plaintiff must first establish a prima facie case of discrimination under the ADA, after which the burden of proof shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employer's conduct.'"  Fox v. Costco Wholesale Corp., 918 F.3d 65, 71 (2d Cir. 2019) (quoting McDonnell Douglas, 411 U.S. at 802).  "If the employer successfully meets its burden, the plaintiff must then 'demonstrate that the employer's assigned reason was a pretext or discriminatory in its application.'"  Id. (quoting McDonnell Douglas, 411 U.S. at 807) (cleaned up).  The burden-shifting framework also applies to disability discrimination claims under the NYSHRL and to retaliation claims under both the ADA and the NYSHRL.  See Tafolla v. Heilig, 80 F.4th 111, 118, 125 (2d Cir. 2023).

Here, genuine disputes of material fact preclude summary judgment on Montaldo's failure to accommodate claims.  However, Montaldo has not shown that he suffered any other form of adverse action and has failed to establish a prima facie case of retaliation under either the ADA or the NYSHRL.  Therefore, summary judgment is granted on all claims except Claims I and II.

## A. Disability Discrimination (Claims I–IV)

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA;

(3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Woolf v. Strada, 949 F.3d 89, 93 (2d Cir. 2020).

The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102 (1)(A). "Major life activities" include, inter alia, "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i). "An impairment substantially limits a major life activity other than work if it prevents an individual from performing an activity that the average person in the general population can perform, or if it significantly restricts the duration, manner, or condition under which an individual can perform the activity as compared to the ability of the average person in the general population." McCowan v. HSBC Bank USA, N.A., 689 F. Supp. 2d 390, 399–400 (E.D.N.Y. 2010); see also Woolf, 959 F.3d at 94 (explaining that, in amending the ADA, Congress intended "to make clear that the substantial-limitation requirement  . . . is not an exacting one"); Felix v. New York City Dep't of Educ., No. 21-cv-6109, 2023 WL 4706097, at *6 (S.D.N.Y. July 24, 2023) (concluding that a reasonable jury could find that a plaintiff who experienced "difficulty breathing, fainting, episodes of dizziness and asthma attacks" was substantially limited in one or more major life activity).

An employer's refusal to make a reasonable accommodation for the plaintiff's known disability constitutes disability discrimination unless the employer demonstrates that the accommodation "would impose an undue hardship" on its operations. 42 U.S.C. § 12112(b)(5)(A); see also Whitney v. Montefiore Med. Ctr., No. 23-7961, 2025 WL 2101512, at *3 (2d Cir. July 28, 2025). "The reasonableness of an employer's accommodation is a "fact-specific" question that

6

often must be resolved by a factfinder." Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 94 (2d Cir. 2015). A reasonable accommodation "is one that enables an individual with a disability . . . to perform the essential functions of that position[.]" Noll, 787 F.3d at 94. The accommodation must be "effective[,]" but "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." Id. at 95.

A discriminatory adverse employment action may also take the form of a "constructive discharge," which occurs when "an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Green v. Brennan, 578 U.S. 547, 555 (2016) (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004)). Coerced retirement can constitute constructive discharge when an employee retires based on changes to his or her working conditions that render their continued employment intolerable. See Caskey v. Cnty. of Ontario, 560 F. App'x 57, 59 (2d Cir. 2014).

"The analysis for ADA and NYSHRL claims is nearly identical." Pepe v. Cnty. of Suffolk, No. 22-cv-03058, 2025 WL 2549986, at *5 (E.D.N.Y. Sept. 4, 2025). The one difference is that, unlike the ADA, the NYSHRL "does not require that a disability be substantially limiting to a major life activity." Gonzalez v. Wicked Taco LLC, 764 F. Supp. 3d 77, 112 (E.D.N.Y. 2025). Instead, under the NYSHRL, a plaintiff "need only prove that he has a medically diagnosable impairment." Id. (cleaned up).

The County argues that Montaldo's disability discrimination claims fail as a matter of law for two reasons. First, the County argues that Montaldo is not disabled within the meaning of the ADA because he "cannot prove that one or more major life activity was substantially limited." (Mot. at 10–12.) Second, the County argues that Montaldo did not suffer an adverse employment action. (Id.)

7

Regarding the County's first argument, the Court finds that there is a disputed issue of fact as to whether Montaldo is disabled within the meaning of the ADA and the NYSHRL.  At the time that Montaldo returned to work, the Police Surgeon determined that Montaldo was limited in his ability to lift, balance, and reach due to his need to "maintain a level head" because "looking up causes pins and needles in [his] left arm." (ECF No. 38-14 at 2.)  Because the stacked arrangement of Montaldo's monitors required him to "always do[] some kind of head tilt," (Montaldo Tr. 39:9–16), it became "very difficult to do the job." (Id., 41:5–13.)  Construing the record evidence in the light most favorable to Montaldo, a reasonable jury could conclude that Montaldo was substantially limited in one or more major life activities. See Felix, 2023 WL 4706097, at *6.  Moreover, the County makes no attempt to argue that Montaldo is not disabled within the scope of the NYSHRL's lower standard.  Accordingly, there remains a live factual dispute as to whether Montaldo is disabled within the meaning of either or both statutes.

As for the County's second argument, the Court finds that there is a factual dispute as to whether Montaldo suffered disability discrimination in the form of failure to accommodate.  However, the Court agrees with the County that no reasonable jury could find that Montaldo suffered an adverse action in the form of forced retirement.

Regarding Montaldo's failure to accommodate claims (Claims I and II), the County argues that Montaldo was reasonably accommodated, stating: "Plaintiff was permitted to use a stool, pursuant to his doctor's recommendation.  Plaintiff also utilized the various positions of the console to permit him to maintain a constant eye level with the monitors, while either standing or sitting." (Mot. at 12.)  However, the County does not dispute that Montaldo "did not get the accommodation he desired." (Def. Resp. 56.1 Stmt. ¶ 3.)  The County ignored Montaldo's request for an ergonomic stool for four months and neglected to reimburse him after he purchased it for himself. (Pl. 56.1 Stmt. ¶¶ 25–26.)  The County also does not dispute that they denied Montaldo's

request to lower or reconfigure the monitors, although they note that Montaldo did not repeat this request after he returned to work.  (Def. Resp. 56.1 Stmt. ¶ 4.)  The County does not provide any rationale for their refusal to lower or reconfigure the monitors or their refusal to reimburse Montaldo for the stool.  Nor does the County attempt to argue that paying for the stool or lowering or reconfiguring Montaldo's monitors would have "impose[d] an undue hardship" on the SCPD's operations.  See 42 U.S.C. § 12112(b)(5)(A).  Regarding Plaintiff's requests to lower or reconfigure the monitors, the County suggests that this accommodation was unnecessary because Plaintiff was able to utilize "the various positions of the console to permit him to maintain a constant eye level with the monitors, while either standing or sitting."  (Mot. at 12.)  However, Montaldo disputes that this configuration was sufficient to accommodate his disability.  Accordingly, there remains a factual dispute as to whether the County failed to reasonably accommodate Montaldo by refusing to purchase the ergonomic stool or to lower his monitors.

The only other adverse action that Montaldo references in his brief is his alleged forced retirement.  Montaldo's brief asserts that his forced retirement provides the basis for his intentional discrimination claims (Claims III and IV).[2]  (See Opp. at 9–10.)  Montaldo claims that he was

---

[2]   The Complaint also alleges that the SCPD "implemented a policy of refusing to accept medical requests to be relieved from [overtime] mandates."  (Compl. ¶¶ 21–26.)  In his 56.1 Statement, Montaldo makes passing references to overtime requirements and suggests that this constitutes an adverse employment action, (Pl. 56.1 Stmt. ¶¶ 7–8), but he never advances any arguments about overtime requirements in his opposition brief.  Montaldo also states in his Rule 56.1 statement that he was "informed by Defendant that he would not be exempt from working mandated overtime," but he cites portions of the deposition transcript that do not support this assertion.  (Pl. 56.1 Stmt., Additional Facts ¶ 11; see also Montaldo Tr. 77:7–79:6.).

The Court does not address this issue further because the Court finds that Montaldo has abandoned any claims relating to overtime mandates.  Nowhere in Montaldo's brief opposing the instant motion for summary judgment does he refer to overtime mandates or increased suffering due to working overtime.  Nor does his brief contend that he suffered an adverse action related to the overtime mandates.  Montaldo opposition addresses only two adverse actions: (1) the denial of his requested accommodations concerning the stool and monitors; and (2) his alleged forced retirement.  Accordingly, he has waived any claims related to overtime mandates.  See, e.g., Camarda v. Selover, 673 F. App'x 26, 30 (2d Cir. 2016) ("Where, as here, a counseled non-moving party submits 'a partial response arguing that summary judgment should be denied as to some claims while not mentioning others,' that response 'may be deemed an abandonment of the unmentioned claims.') (quoting Jackson v. Federal Express, 766 F.3d 189, 195 (2d Cir. 2014)); Carter-Marks v. Alstom Transp. USA Inc., 800 F. Supp. 3d 423, 444–46 (E.D.N.Y. 2025) (finding that plaintiff abandoned claims under 42 U.S.C. § 1985, the Rehabilitation Act, the NYSHRL, and the NYCHRL because her brief in opposition to summary judgment did not contain any arguments related to those claims).

forced to retire in 2018, four years earlier than he had planned, in part because of the lasting pain from his 2013 neck injury. (Montaldo Tr. 80:18–81:13 (stating that he retired based on the combined effect of the 2013 and 2017 injuries).) The County contends that Montaldo's 2013 neck injury played no role in his retirement decision, arguing that he retired voluntarily because the "2017 fall rendered him unable to perform the essential functions of the job[.]" (ECF No. 38-27 ("Def. Reply") at 2.) Whether or not Montaldo's 2013 neck injury contributed to his decision to retire, there are no facts in the record that support Montaldo's claim that the SCPD coerced him into early retirement. Despite the pain from his 2013 injury, Montaldo worked his regular shift for over three years, from January 24, 2014 until he fell on August 6, 2017.[3] (Pl. 56.1 Stmt. ¶ 24.) Montaldo has not shown that there were any changes to his working conditions during those three years that rendered his continued employment intolerable. See Caskey, 560 F. App'x at 59. Accordingly, the County is entitled to summary judgment on Claims III and IV.

**B. Retaliation (Claims V and VI)**

To prevail on a retaliation claim, a plaintiff must show that: "(i) [he] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff, and (iv) a causal connection exists between the protected activity and the adverse action." Tafolla, 80 F.4th at 125 (internal citation omitted). "Requests for accommodation and even informal complaints of discrimination qualify as protected activity under the ADA." Pepe, 2025 WL 2549986, at *5. An adverse course of action is one that would "dissuade a reasonable worker from making or supporting a charge of discrimination." Id. (internal citation omitted). The requisite causal connection can be established either "(1) indirectly, by showing that the protected activity was followed closely by

---

[3] The record does not show that he made any requests for accommodation after he purchased the stool on April 2, 2014. The record also does not show that he made any complaints about his working conditions after he filed the EEOC Charge on July 30, 2014.

discriminatory treatment, or through other circumstantial evidence . . . , or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Littlejohn v. City of New York, 795 F.3d 297, 319 (2d Cir. 2015).  The standard for retaliation is the same under the ADA and the NYSHRL.  See Pepe, 2025 WL 2549986, at *6.

The County argues that Montaldo's retaliation claims fail because "Plaintiff did not suffer any adverse employment action, because of protected activity." (Mot. at 13–14.)  Montaldo's only response is that "being forced into an early retirement does qualify as an adverse employment action." (Pl. Opp. at 10.)

As explained supra, nothing in the record supports Montaldo's allegation that SCPD forced him to retire.  Additionally, Montaldo never identifies which of his actions constitute the relevant protected activity for his retaliation claim.  Nor does he argue that there was a causal connection between any protected activity and the County allegedly coercing him to retire early.  Therefore, Montaldo has waived any such arguments.  Moreover, the record is devoid of any evidence that the County took any retaliatory actions against Montaldo that forced him into retirement.[4]

Accordingly, the County is entitled to summary judgment on Claims V and VI.

### III.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED with respect to Claims I and II and GRANTED with respect to Claims III, IV, V and VI.

**SO ORDERED.**

Dated:    March 31, 2026
   Central Islip, New York

           /s/ JMA
          JOAN M. AZRACK
          UNITED STATES DISTRICT JUDGE

---

[4] According to Montaldo, the County denied his requests to alter the monitor configuration before he returned to work in January 2014.  He then worked for the next three years.  Nothing in the record suggests that the County's denial of Montaldo's request to lower or reconfigure the monitors was retaliatory.

11